UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE RHINE INDUSTRIES, LLC )<br>      Plaintiff )<br> )<br>v. )<br> )<br>VINYL TECHNOLOGIES, INC. D/B/A VYTEK; )<br>DIRK BURROWES )<br>      Defendants )<br> ) | Civil Action No.  15-13203 |

## **COMPLAINT**

Plaintiff Blue Rhine Industries, LLC, a United Arab Emirates limited liability corporation, brings this action against defendants Dirk Burrowes ("Burrowes") and his company Vinyl Technologies, Inc. d/b/a Vytek ("Vytek") (collectively, "Defendants").   Blue Rhine Industries, LLC seeks to recover over $165,601.00 from Defendants that was fraudulently and deceptively obtained from Plaintiff by the sale of a 450 watt L-Star System LST 4896 Laser System and accompanying components (the "Laser") that does not perform as promised. Plaintiff asserts claims for intentional/negligent misrepresentations, breach of contract, breach of warranty, breach of the implied covenant of good faith and fair dealing, unjust enrichment and a 93A claim for unfair and deceptive trade practices.

## **Parties**

1.     Plaintiff Blue Rhine Industries, LLC ("Blue Rhine") is a United Arab Emirates limited liability company that is headquartered in Dubai.  Blue Rhine is a leading distributor and manufacturer for the advertising, signage and construction industry in the Middle East, the Indian sub-continent and Africa.

2.      Defendant Dirk Burrowes ("Burrowes") is, upon information and belief, a citizen of Massachusetts who resides at 15 Pearl Rd. Ashburnham, Massachusetts, and is the President, Treasurer, Secretary, and Director of Defendant Vinyl Technologies, Inc. d/b/a Vytek.

3.      Defendant Vinyl Technologies d/b/a Vytek ("Vytek") is a Massachusetts corporation with its principal office at 195 Industrial Rd, Fitchburg, MA.  On information and belief, Vytek manufactures laser cutting, marking and engraving equipment.

## Jurisdiction and Venue

4.       This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C § 1332, as the plaintiff is a citizen of a foreign state and the amount in controversy exceeds $75,000 exclusive of interest and costs.

5.      Venue in this district is proper pursuant to 28 U.S.C § 1391, in that the defendants or their agents reside or may be found here, a substantial part of the events giving rise to plaintiff's claims occurred here, and the Defendants transact business here.

## Facts

Blue Rhine's Initial Encounter with the Defendants

6.      Blue Rhine first encountered Vytek and Burrowes while attending the ISA International Sign Expo on April 23-25, 2014 in Orlando, Florida ("Sign Expo").  As a leading manufacturer and distributor in the Middle East, Blue Rhine's representatives, Mr. Anand Joseph and Mr. Vinod Kumar ("Blue Rhine's Representatives") attended the Sign Expo to investigate possible business opportunities and connections for Blue Rhine's business and the business of its affiliated company Blue Rhine Trading, LLC ("Blue Rhine Trading").

7.      At the Sign Expo, Burrowes and Robin Barbero ("Ms. Barbero") of Vytek were showcasing Vytek's 450 watt L-Star Laser ("L-Star Laser"), and presented several finished

samples that were purportedly cut by a L-Star Laser ("Samples").  The Samples included a 3 mm

304 Grade Stainless Steel sample, a 5 mm 304 Grade Mild Steel sample, and other samples.

8.      Burrowes stated unequivocally that a L-Star Laser cut all of the Samples, but

claimed these capabilities could not be demonstrated at the Sign Expo because of the exhibition

rules at the Sign Expo.  On information and belief, Burrowes statement that a L-Star Laser cut

the Samples is false and/or a gross misrepresentation.

9.      Blue Rhine's Representatives were intrigued by the apparent capabilities of the L-

Star Laser, and wanted to develop a business relationship.  Blue Rhine wanted its affiliate

company, Blue Rhine Trading, to become Vytek's exclusive dealer in the Dubai Region (the

"Region").  Blue Rhine's Representatives promised to get back in touch with the Defendants in

order to further investigate the possibilities of a business relationship.

August 2014 Facility Visit to Vytek

10.     Blue Rhine's Representatives visited Vytek's facility in Fitchburg, Massachusetts

on August 11-12, 2014 to learn more about the capabilities of the L-Star Laser and other lasers

sold by Vytek ("August Facility Trip").

11.     During the August Facility Trip, Blue Rhine's Representatives wanted a

demonstration of the capabilities of the L-Star Laser to confirm that it could cut the quality and

types of materials shown by the Samples.  The demonstration was arranged by Ms. Barbero on

Monday, August 11, 2014, but the L-Star Laser was unable to satisfactorily cut acrylic or the

other types of materials shown as the Samples at a quality suitable for Blue-Rhine's customers.

12.     Blue Rhine's Representatives informed Ms. Barbero of their dissatisfaction with

the L-Star Laser, and she told them that the L-Star Laser could perform better but needed

calibration by Burrowes.  She stated that Burrowes would meet with Blue Rhine's

3

Representatives on Tuesday morning and re-calibrate the L-Star Laser to demonstrate its full cutting capabilities.

13.     Burrowes did not show up the morning of Tuesday, August 12.  In his absence, Blue Rhine's Representatives and Ms. Barbero discussed Blue Rhine's purchasing requirements from Vytek so that Blue Rhine could use the L-Star Laser as a demonstration model to assist Blue Rhine Trading in becoming Vytek's dealer in the Region.

14.     Blue Rhine required and Ms. Barbero agreed to the following (the "Representations"):

      a.  The Laser would cut the following materials at the following thicknesses:
- 304 grade Stainless Steel - 3 mm
- 304 grade Mild Steel - 5 mm
- Acrylic - 25 mm

      b.  Vytek would deliver the Laser to Blue Rhine before the SGI Dubai Expo ("Dubai Expo") on January 11-13, 2015 so that Blue Rhine could display the Laser at the Dubai Expo.  A Vytek engineer/representative would attend the Dubai Expo and help demonstrate the Laser for potential customers.

      c.  After the Dubai Expo, the Vytek Engineer would help install the Laser at Blue Rhine's facility in Dubai so that Blue Rhine could further demonstrate the Laser's capabilities to potential customers in the Region.

15.     In exchange, Ms. Barbero insisted and Blue Rhine's Representatives agreed that Blue Rhine would send engineers to Fitchburg for training by Vytek about how to use the software and operate a L-Star Laser.

16.     Burrowes finally showed up for the meeting at 4 p.m. on Tuesday, August 12th. He re-calibrated the L-Star Laser, but it was only able to cut 3 mm of Mild Steel at an acceptable quality.  When informed of the Representations, Burrowes insisted that any new L-Star Laser purchased by Blue Rhine would be able to meet the cutting specifications in ¶14a. and that the current quality problems were due to the old demonstration laser.  Burrowes also agreed to the

other two Representations in ¶14b-c.  On information and belief, Burrowes misrepresented the cutting capabilities of the L-Star Lasers and the Laser cannot cut materials at the thicknesses promised in ¶14a.  Also on information and belief, Burrowes misrepresented Vytek's willingness to honor the other Representations in ¶14b-c and never intended to send a Vytek engineer to the Region to help Blue Rhine at the Dubai Expo or to help install the Laser at Blue Rhine's facility.

17.    Based on the Representations in ¶14, Blue Rhine ordered the Laser and paid $78,005.50 on August 24, 2014, which was approximately 50% of the total amount owed for the Laser.

18.    The Laser was shipped to Dubai C.I.F (Cost, Insurance Freight) around November 12, 2014 and Blue Rhine paid the remaining balance of $82,595.50 on November 11, 2014.

<u>Blue Rhine's Marketing Efforts on Behalf of Vytek</u>

19.    Relying on the Representations, Blue Rhine began actively seeking potential customers for L-Star Lasers and other Vytek lasers at considerable cost and expense to Blue Rhine.  To facilitate sales to third-parties, Ms. Barbero sent a cutting chart of the metal cutting capabilities for the various L-Star Lasers ("Cutting Chart") to Blue Rhine on September 3, 2014.

20.    The Cutting Chart is identical to the promises made in Representation ¶14a, except for the exclusion of the cutting capabilities with respect to acrylic.  When soliciting customers for Vytek, Blue Rhine relied on the Cutting Chart and other sales materials provided by Vytek and provided the Cutting Chart to potential customers in the Region.  On information and belief, the information contained in the Cutting Chart is false and/or a gross misrepresentation and the Laser does not have the metal cutting capabilities in the Cutting Chart. Consequently, Blue Rhine's reputation in the Region has been harmed and it lost considerable

goodwill, money, and expense marketing and soliciting customers for Vytek based on Vytek's false and misleading information.

<u>Blue Rhine's Training at Vytek</u>

21.     As Vytek requested, Blue Rhine sent two engineers (the "Engineers") to Vytek at considerable time, cost and expense on December 1-5, 2014 for training about how to operate the L-Star Laser and its software.

22.     Although the Engineers received helpful training, the L-Star Laser still did not cut as promised.  One Engineer said that the laser was only able to cut 2 mm of stainless steel and the results looked like something "cut by axle" and that Blue Rhine's customers "would not accept the quality."  This is completely at odds with the Representation in ¶14a and the Cutting Chart, which state that a L-Star Laser should be able to cut 3 mm of stainless steel.

23.      Blue Rhine became alarmed about the Engineers' reports and reached out to Vytek to confirm the capabilities of the L-Star Laser.  Ms. Barbero confirmed the accuracy of the Cutting Chart with Burrowes and wrote that Burrowes was "confident" that the Laser would cut the thicknesses specified in the Cutting Chart.  On information and belief, these statements are false and a misrepresentation about the cutting capacities of the Laser.

<u>Vytek's Failure to Attend the Dubai Expo or Send Samples</u>

24.     Based on Vytek's promise to attend the Dubai Expo in ¶14b and Vytek's multiple email confirmations that someone would be attending, Blue Rhine spent considerable time, effort, and money to advertise and promote Vytek's lasers for the Dubai Expo.  These activities include, but are not limited to preparing flyers to distribute to customers; conducting training classes for sales representatives to explain the Laser; reserving space of about 3m x 4m for the Laser; and paying for excess power for the Laser and the Chiller.

25.     Despite these promises, Vytek never sent a representative to the Dubai Expo but Burrowes cancelled for Vytek on January 5, 2015, which is less than one week before the beginning of the Dubai Expo.  Instead, Burrowes promised to send samples that could be used by Blue Rhine at the Dubai Expo.  But these promised samples did not arrive until one day after the Dubai Expo ended.

26.     Given this late notice of cancellation and Vytek's failure to timely send samples, Blue Rhine had to scramble to find a suitable replacement for Vytek and explain to prospective customers why Vytek was not attending the Dubai Expo.   Consequently, Blue Rhine lost considerable good will and reputation in the Region, as well as the loss of time, effort and money spent marketing on behalf of Vytek.

Vytek's Failure to Timely Help Install the Laser and the Laser's Failure to Cut Properly

27.     The Laser arrived at Blue Rhine's facilities in Dubai on January 10, 2015.  After its arrival, the Laser sat unopened for several weeks because Blue Rhine was waiting for the on-site installation training promised in ¶14.c from Vytek.  Blue Rhine sent several emails to the Defendants pleading with them to honor their promises and send someone to help install the Laser.  The Defendants refused and told Blue Rhine to install the Laser themselves and try to use it.  On February 28, 2015 Blue Rhine finally turned the Laser on and it immediately started smoking.

28.     Blue Rhine contacted Vytek and Vytek sent parts to repair the Laser.  Vytek also finally sent a technician, Bryant Carter ("Mr. Carter"), to help Blue Rhine install the parts, properly install the Laser, and help with cutting.  Despite the Representation in ¶14.c, Vytek invoiced Blue Rhine an additional $5,000 for Mr. Carter's trip to Dubai and required Blue Rhine to pay the invoice before Mr. Carter would come to Dubai.

29.     Mr. Carter stayed in Dubai from March 16, 2015 until March 20, 2015 (the "March 2015 Visit") and helped Blue Rhine properly install the Laser.  Mr. Carter also tried to show Blue Rhine how to cut metal and acrylic at the thicknesses promised in ¶14.a and the Cutting Chart.  Mr. Carter failed and the Laser was unable to satisfactorily cut various metals and other materials at anywhere near the promised thicknesses.  Instead, Mr. Carter was only able to cut 1.2 mm of stainless steel with unsatisfactory burr, and 2 mm of mild steel.  These cuts are completely unsatisfactory and far below the thickness and quality that were promised to Blue Rhine at the August 2014 Facility Visit.

Blue Rhine's Efforts To Obtain a Refund

30.     After the March 20, 2015 Visit, Blue Rhine attempted to return the Laser, and at the very least, have Vytek refund its payment of $160, 601 for the Laser plus cost of shipping the Laser back to Vytek, which is approximately $5,000.

31.     The Defendants refused but instead tried to convince Blue Rhine to purchase a more expensive laser or add additional applications.

**COUNT I**
**(Intentional and/or Negligent Misrepresentation)**

32.     Plaintiff realleges and incorporates herein by reference the allegations contained in paragraphs 1 through 31 above.

33.     The Defendants intentionally, knowingly, and/or negligently made false statements and misrepresentations to Blue Rhine, as set forth above, concerning the cutting capabilities of L-Star Lasers, the Laser, Vytek's commitment to attend the Dubai Expo, and Vytek's commitment to help Blue Rhine install the Laser.

34.     Plaintiff reasonably relied on the Defendants false statements and misrepresentations and purchased the Laser; solicited customers on behalf of Vytek; sent

Engineers to train at Vytek; advertised and promoted Vytek's lasers for the Dubai Expo and in the Region; and engaged in other activities to benefit Vytek.  As the intended and predictable proximate result of Vytek's false statements and misrepresentations, Plaintiff was harmed and continues to suffer harm for which Defendants are liable.

35.    Plaintiff has been damaged by Defendants' fraudulent and/or negligent misrepresentations and conduct in an amount in excess of $165,601.00, to be determined at trial.

## COUNT II
### (Breach of Contract)

36.    Plaintiff realleges and incorporates herein by reference the allegations contained paragraph 1 through 35 above.

37.    Plaintiff Blue Rhine entered an Agreement with Burrowes and Vytek pursuant to which (i) Plaintiff agreed to pay $160,601 to Defendants and send Engineers to Vytek's Fitchburg's facility and (ii)  Vytek agreed to provide a Laser with the cutting capabilities outlined in ¶14a; attend the Dubai Expo to help Blue Rhine market and sell the Laser; and install the Laser at Blue Rhine's facilities in Dubai.

38.    Blue Rhine paid $160,601 to Vytek for the Laser and incurred additional costs to send its Engineers to Vytek's Fitchburg facility for training.

39.    Defendants breached the agreement with Plaintiff by: failing to provide  a Laser with the appropriate cutting capabilities; failing to attend the Dubai Expo or provide the promised samples; and failing to install the Laser at Blue Rhine's Dubai facility without an additional payment of $5,000.

40.    Plaintiff has been damaged as a consequence of Burrowes and Blue Rhine's breach of contract in an amount in excess of $165,501.00 to be determined at trial.

## Count III
### (Breach of Warranty)

41.     Plaintiff realleges and incorporates herein by reference the allegations contained in paragraphs 1 through 40 above.

42.     At the Expo, Burrowes and Vytek presented Samples to Blue Rhine that were allegedly cut by an L-Star Laser.  The Samples included a 3mm 304 grade Stainless Steel sample; a 5 mm 304 Grade Mild Steel Sample; and samples cut from other material.

43.     During the August 2014 Facility Trip as detailed in ¶14.a, Burrowes and Vytek promised that the Laser would be able to cut 304 grade Stainless Steel at a thickness of 3 mm; 304 grade Mild Steel at a thickness of 5 mm; and acrylic at a thickness of 25 mm.  These promises were reiterated numerous times between September, 2014 to January, 2015.

44.     These promises became part of the basis of the bargain and Blue Rhine reasonably relied on these promises when ordering the Laser and fully expected that the Laser would be able to satisfactorily cut the various materials above at the promised thicknesses.

45.     The Laser cannot cut the various materials at the thicknesses specified in ¶14.a and fails to satisfy the express warranty promised by the Defendants.

46.      Plaintiff has been damaged as a consequence of the Laser's failure to satisfy the express warranty promised by the Defendants in an amount in excess of $165,501.00 to be determined at trial.

## Count IV
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

47.     Plaintiff realleges and incorporates herein by reference the allegations contained in paragraphs 1 through 46 above.

48.     Every contract contains an implied covenant of good faith and fair dealing between the parties to the contract.

49.     The implied covenant of good faith and fair dealing means that a party may not do anything that will have the effect of destroying or injuring the right of the other party to receive the benefits of the contract.

50.     Plaintiff Blue Rhine entered an Agreement with Burrowes and Vytek pursuant to which (i) Plaintiff agreed to pay $160,601.00 to Defendants and send Engineers to Vytek's Fitchburg's facility and (ii)  Vytek agreed to provide a Laser with the cutting capabilities outlined in ¶14.a; attend the Dubai Expo to help Blue Rhine market and sell the Laser; and install the Laser at Blue Rhine's facilities in Dubai.

51.     Blue Rhine paid $160,60.001 to Burrowes and Vytek for the Laser and incurred additional costs to send its Engineers to Vytek's Fitchburg facility for training.

52.     The Laser cannot cut the various materials at the thicknesses specified in ¶14.a and Vytek and Burrowes did not honor their other promises to Blue Rhine.

53.     Plaintiff has been damaged as a consequence of Burrowes and Blue Rhine's actions in an amount in excess of $165,501.00 to be determined at trial.

## Count V
### (Unjust Enrichment)

54.      Plaintiff realleges and incorporates herein by reference the allegations contained in paragraphs 1 through 53 above.

55.     Burrowes and Vytek have been unjustly enriched by the amounts that Blue Rhine provided them for the Laser and other services which Burrowes and Vytek have refused to reimburse and/or failed to return.

56.     Defendants in equity and good conscience should pay to Plaintiff as a result of defendants' unjust enrichment an amount in excess of $165,501.00 to be determined at trial.

## Count VI
### (Unfair and Deceptive Trade Practices - G.L. c. 93A)

57.     Plaintiff realleges and incorporates herein by reference the allegations contained in paragraphs 1 through 56 above.

58.     Plaintiff is a "person" and engages in "trade or commerce" within the meaning of G.L. c. 93A §1.

59.     Burrowes is a "person" and engages in "trade or commerce" within the meaning of G.L. c. 93A §1.

60.     Vytek is a "person" and engages in "trade or commerce" within the meaning of G.L. c. 93A §1.

61.     Vytek's and Burrowes wrongful acts and practices, as set forth herein, constitute unfair methods of competition and unfair or deceptive acts or practices that are willful and knowing violations of G.L. c. 93A.

62.     Vytek's and Burrowes wrongful acts occurred during the conduct of trade or commerce primarily and substantially in the Commonwealth of Massachusetts.

63.     Plaintiff Blue Rhine has suffered substantial damages and losses as a result of Defendant's unfair and deceptive acts and practices.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff Blue Rhine prays that it be awarded the following relief:

1.     Enter judgment in its favor and against the Defendants on all Counts of the Complaint;

2.     Award Plaintiff all damages it sustained as a result of Defendant's conduct in an amount to be fully determined at trial, including but not limited to:

   a.   $165,601.00 Paid to Defendants for the Laser and the March 2015 Visit;
   b.   Expenses for the August Facility Trip;

    c.  Shipping Clearing Charges at the Port in Dubai;
    d.  December training expenses for Engineers;
    e.  Marketing spent in Region and at Dubai Expo on Vytek's behalf;
    f.  Blue Rhine's loss of good will in the Region due to Vytek's conduct;
    g.  Cost of installing demo center for Laser at Blue Rhine's facility;
    h.  Estimated cost to ship Laser back to Vytek; and
    i.  Other Damages to be specified at a later date.

3.      Pursuant to Count IV of the Complaint, double or treble the amounts awarded under the preceding paragraph and reasonable attorneys fees pursuant to G.L. c. 93A §11;

4.      the costs of this action;

5.      Pre- and post-judgment interest; and

6.      Grant such further relief as this Court deems just and proper.

                Respectfully submitted

                Blue Rhine Industries, LLC
                By its attorney

                /s/ Mark A. Bross
                Mark A. Bross (BBO #669831)
                mbross@brosslawllc.com
                BROSS LAW, LLC
                11 Deep Run
                Cohasset, MA 02025
                (781) 383-0458

Dated:  August 19, 2015

## CERTIFICATE OF SERVICE

        I hereby certify that on August 19, 2015 a true and accurate copy of the foregoing document was filed electronically.  Notice of this filing will be electronically mailed to all parties registered with the Court's electronic filing system.  Additionally, a copy of the foregoing was served upon each party by hand or any other manner of service permitted by the Federal Rules of Civil Procedure.

                /s/ Mark A. Bross